JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
NANCY L. FINEMAN (SBN 124870)
nfineman@cpmlegal.com
ALEXANDRA P. SUMMER (SBN 266485)
asummer@cpmlegal.com
CAMILO ARTIGA-PURCELL (SBN 273229)
cartigapurcell@cpmlegal.com
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577

BRUCE REED GOODMILLER (SBN 121491)
Bruce_goodmiller@ci.richmond.ca.us
RACHEL H. SOMMOVILLA, (SBN 231529)
rachel_sommovilla@ci.richmond.ca.us
**CITY OF RICHMOND**
450 Civic Center Plaza
P.O. Box 4046
Richmond, CA 94804
Telephone: (510) 620-6509
Facsimile:  (510) 620-6518

*Attorneys for Plaintiff City of Richmond*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CITY OF RICHMOND, a municipal corporation,** | Case No. 3:17-cv-01535-WHO |
| Plaintiff, | **CITY OF RICHMOND'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| **DONALD J. TRUMP, President of the United States, JOHN F. KELLY, Secretary of the United States Department of Homeland Security, JEFFERSON B. SESSIONS, Attorney General of the United States, and the UNITED STATES OF AMERICA,** | Date:   May 10, 2017<br>Time:  2:00 p.m.<br>Judge: Hon. William H. Orrick<br>Dept.: Courtroom 2<br><br>Complaint Filed: March 21, 2017<br>No Trial Date |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR PRELIMARY INJUNCTION.........................1

MEMORANDUM OF POINTS AND AUTHORITIES...............................................2

I.    INTRODUCTION............................................................................2

II.    STATEMENT OF FACTS................................................................5

     A.    THE EXECUTIVE ORDER THREATENS TO WITHHOLD AND CLAW-BACK ALLOCATED FEDERAL FUNDS.........................................5

     B.    RICHMOND'S POLICIES MAY VIOLATE THE EXECUTIVE ORDER ............6

     C.    RICHMOND RELIES ON FEDERAL FUNDING TO PROVIDE ESSENTIAL SERVICES; WITHDRAWAL OF FEDERAL FUNDS WOULD BE CATASTROPHIC ...........................................................................7

     D.    THE EXECUTIVE ORDER PUTS RICHMOND IN AN UNTENABLE AND DANGEROUS POSITION ..................................................................9

III.    LEGAL STANDARD ....................................................................10

IV.    ARGUMENT.................................................................................11

     A.    THE CITY IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS........11

         1.    The Executive Order Usurps Congress' Spending Power .......11

         2.    The Executive Order Unconstitutionally Imposes New And Unrelated Conditions On Existing Federal Grants .................11

         3.    The Executive Order Is Unconstitutionally Coercive...............13

         4.    The Executive Order Violates The Tenth Amendment............13

         5.    The Executive Order Induces Violations Of The Fourth Amendment ....................................................................15

         6.    The Executive Order Is Also Unconstitutionally Vague In Violation Of The Due Process Clause Of The Fifth Amendment ....................................................................16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        **B.**    **RICHMOND WILL SUFFER IRREPARABLE HARM WITHOUT PRELIMINARY RELIEF** ...............................................................................**17**

        **C.**    **THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR A PRELIMINARY INJUNCTION** ..........................................................**19**

**V.**    **CONCLUSION** ......................................................................................**20**

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**CASES**

4

*Alliance for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ....................................................................10

5

*Ariz. Dream Act Coal. v. Brewer,*
6   No. 15-15307, 2017 U.S. App. LEXIS 1919 (9th Cir. Feb. 2, 2017) ..........19

7

*Clinton v. City of New York,*
8   524 U.S. 417 (1998) ...................................................................................11

9

*de Jesus Ortega Melendres v. Arpaio,*
695 F.3d 990 (9th Cir. 2012) ....................................................................17
10

11

*Desertrain v. City of L.A.,*
754 F.3d 1147 (9th Cir. 2014) ..................................................................16
12

*Drakes Bay Oyster Co. v. Jewell,*
13   747 F.3d 1073 (9th Cir. 2014) ..................................................................19

14

*Elrod v. Burns,*
427 U.S. 347 (1976) ...................................................................................17
15

16

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ...........................................................................3, 16, 17
17

18

*In re Aiken Cty.,*
725 F.3d 255 (2013) ...................................................................................11

19

*Mendia v. Garcia,*
20   165 F. Supp. 3d 861 (N.D. Cal. 2016) .....................................................16

21

*Miranda-Olivares v. Clackamas Cty.,*
22   No. 3:12-cv-02317-ST, 2014 U.S. Dist. LEXIS 50340 (D. Or. Apr. 11, 2014) .......................16

23

*Morales v. Chadbourne,*
793 F.3d 208 (1st Cir. 2015) .....................................................................16
24

25

*Nat'l Fed'n of Indep. Bus v. Sebelius,*
567 U.S. 519, 132 S. Ct. 2566 (2012) ..............................................2, 13, 14

26

*New York v. United States,*
27   505 U.S. 144 (1992) ...........................................................................12, 13

28

*Orellana v. Nobles Cnty.*,
   No. 15-3852 ADM/SER, 2017 U.S. Dist. LEXIS 2438 (D. Minn. Jan. 6, 2017)......................16

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981)...........................................................................................................12

*Printz v. United States*,
   521 U.S. 898 (1997).......................................................................................................13

*Raich v. Gonzales*,
   500 F.3d 850 (9th Cir. 2007) .........................................................................................14

*South Dakota v. Dole*,
   483 U.S. 203 (1987)...............................................................................................12, 16

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) .......................................................................................10

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) .........................................................................................10

*United States v. Williams*,
   553 U.S. 285 (2008).......................................................................................................16

*Valle Del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) .......................................................................................16

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) .................................................................................10, 17

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)...........................................................................................................10

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952).................................................................................................4, 11

## <u>CONSTITUTIONAL PROVISIONS</u>

**United States Constitution**

   Article I, § 8 ...................................................................................................................11

   Article II, § 3 ..................................................................................................................11

   Article III, § 1 ................................................................................................................10

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

CITY OF RICHMOND'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
Case No. 3:17-cv-01535 WHO
      iv

1

## **OTHER AUTHORITIES**

2

3   Executive Order 13768,
        "Enhancing Public Safety in the Interior of the United States"........................................... *passim*
4

5

## **STATUTES**

6

7   8 C.F.R. § 287.7 ............................................................................................................15

8   8 U.S.C. 1373 ............................................................................................... *passim*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that on <u>May 10, 2017</u>, at <u>2:00 p.m.</u> or as soon thereafter as the matter may be heard before the Honorable William H. Orrick, in Courtroom 2 of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, Plaintiff City of Richmond ("Richmond") will and hereby does move the Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction against Defendants Donald J. Trump, President of the United States of America; John F. Kelly, in his official capacity as Secretary of the United States Department of Homeland Security; Jefferson B. Sessions, in his official capacity as Attorney General of the United States; and the United States of America (collectively, "Defendants"); and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them.

Richmond seeks a nationwide preliminary injunction (1) prohibiting Defendants from enforcing Section 9(a) of Executive Order 13768, entitled "Enhancing Public Safety in the Interior of the United States" ("Executive Order"); (2) prohibiting Defendants from taking any action pursuant to the Executive Order that would withhold or "claw-back" federal funds appropriated or allocated by Congress; and (3) prohibiting Defendants from taking any action pursuant to the Executive Order that would declare or render any jurisdiction ineligible for federal funds.

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Request for Judicial Notice, the supporting declarations of Tom Butt (Mayor), William Lindsay (City Manager), Gayle McLaughlin (City Council Member), Allwyn Brown (Chief of Police), and Adrian Sheppard (Fire Chief), as well as the papers, evidence and records on file in this action, and any other written or oral evidence or argument as may be presented at or before the time this motion is heard by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

By this Motion, Plaintiff City of Richmond respectfully asks the Court to enter a preliminary injunction prohibiting implementation and enforcement of Section 9(a) of Executive Order 13768, entitled "Enhancing Public Safety in the Interior of the United States," issued by President Trump on January 25, 2017 (the "Executive Order").  The Executive Order, in violation of the United States Constitution, seeks to force local police departments, such as the Richmond Police Department, to enforce federal immigration law.  The Executive Order is in direct violation of the Constitution because it allows the Attorney General and Secretary of Homeland Security, based upon their discretion, to withhold federal funds from public entities that are "sanctuary jurisdictions" who "willfully refuse" to comply with 8 U.S.C. § 1373, a statute which seeks to regulate state and local jurisdictions' response to immigration requests.

On March 27, 2017, Attorney General Jefferson Sessions announced that "the Department of Justice will require jurisdictions seeking or applying for Department grants to certify compliance with [8 U.S.C.] Section 1373 as a condition for receiving these awards," and that the Justice Department will take "all lawful steps to claw-back any funds awarded to a jurisdiction that willfully violates 1373."

Our U.S. Supreme Court has said that this use of an Executive Order to coerce Richmond or any other jurisdiction through a threat of the loss of all federal funds is unconstitutional.  *Nat'l Fed'n of Indep. Bus v. Sebelius,* 567 U.S. 519, 132 S. Ct. 2566, 2602-04 (2012).  "When, for example, such conditions take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the states to accept policy changes."  132 S. Ct. at 2604.  Section 9(a) of the Executive Order directs the Attorney General to "take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law."

The term "sanctuary jurisdiction" is not defined in the Executive Order or in any federal statute or regulation.  While many public entities, including Richmond, have been referred to as "Sanctuary Cities" and Richmond is proud to support its immigrants, the policies of the different

jurisdictions differ substantially.  It is unclear if Richmond will be considered a "sanctuary

jurisdiction" subject to the loss of all federal funds.  The Executive Order provides no guidance to

Richmond on how to make this determination and there is no legal precedent for Richmond to

consult to make this determination.  Based upon statements made by President Trump and others,

Richmond believes it may be swept up as a sanctuary jurisdiction under the Executive Order.  The

Executive Order violates the Due Process Clause because it is unconstitutionally vague and

unenforceable against a city like Richmond, California.  *Grayned v. City of Rockford*, 408 U.S.

104, 108 (1972).

Moreover, the Executive Order does not define what actions or inaction can be

considered by the Attorney General and Secretary of Homeland Security as a willful refusal to

comply with 8 U.S.C. § 1373 and there is no legal precedent defining what constitutes a willful

refusal to comply with 8 U.S.C. § 1373.  Richmond does comply with 8 U.S.C. § 1373.  This is an

additional reason that the Executive Order is unconstitutionally vague and unenforceable pursuant

to Supreme Court precedent.

Given the vagueness of the Executive Order and the discretion it provides to the Attorney

General and Secretary of Homeland Security to withhold federal funds, Richmond faces imminent

danger of losing all federal funding because of legislation that it enacted twenty-five years ago to

foster trust between its police department and residents.  Richmond has already been harmed by

the uncertainty caused by the Executive Order.  The Defendants intend to immediately begin

enforcing the Executive Order, and the Executive Order does not provide any policies or

procedures to challenge the findings of the Attorney General or Secretary of Homeland Security.

Accordingly, this Court is the only vehicle for Richmond to obtain relief to stop the calamitous

effects that the Executive Order will have on Richmond.

Richmond directly receives federal funds each year and also receives State funds, most of

which are passed through federal funds.  The funds are used to fund vital services, and only a

small amount are used for law enforcement or immigration.  Most are used for housing and

infrastructure improvements, and to provide relief to the City's most vulnerable residents.  The

loss of these funds will have a direct and substantial effect on Richmond and its citizens.  None of

the grants of money by the federal government to Richmond were conditioned on Richmond's compliance with any immigration law.  The Executive Order seeks to retroactively tie the receipt of federal funds to Richmond's compliance with the Executive Order, and specifically immigration laws, which is unconstitutional on its face.

While Presidents have the ability to issue executive orders, the President's power "must stem either from any act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  There is no authority from an act of Congress or from the Constitution for President Trump to have issued the Executive Order.

The Executive Order is an impermissible and illegal order because:

(1)     the Executive Order violates the Tenth Amendment of the United States Constitution;

(2)     the Executive Order seeks to give two Cabinet members the unfettered discretion to take away all federal funding from Richmond, a power that no branch of the federal government has;

(3)     the Executive Order impermissibly usurps the rights of the Legislative branch regarding appropriating and spending monies thus violating the separation of powers clause of the Constitution;

(4)     the Executive Order violates the due process clause because it is unconstitutionally vague in its definition of "sanctuary jurisdiction," "willful refusal to comply," and the unfettered enforcement discretion it gives to the Attorney General and Secretary of Homeland Security;

(5)     the Executive Order exposes state and local goverrnments to liability under the Fourth Amendment of the Constitution for improperly detaining people; and

(6)     the Executive Order imposes additional costs to comply with the Executive Order, which costs the federal government will not reimburse.

Because the Executive Order is unconstitutional and, as set forth further below, Richmond is likely to suffer irreparable harm in the absence of preliminary relief, the City of Richmond

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

respectfully asks the Court to enter the requested preliminary injunction prohibiting

implementation and enforcement of Section 9(a) of the Executive Order.

## II.   STATEMENT OF FACTS

### A.   THE EXECUTIVE ORDER THREATENS TO WITHHOLD AND CLAW-BACK ALLOCATED FEDERAL FUNDS

On January 25, 2017, President Donald J. Trump issued Executive Order 13768, entitled

"Enhancing Public Safety in the Interior of the United States." RJN, Ex. 1 ("Executive Order").[1]

The Executive Order declares, "Sanctuary jurisdictions across the United States willfully violate

Federal law in an attempt to shield aliens from removal from the United States.  These

jurisdictions have caused immeasurable harm to the American people and to the very fabric of our

Republic." *Id.* § 1.  The Executive Order sets forth the policy that "jurisdictions that fail to

comply with applicable Federal law do not receive Federal funds, except as mandated by law." *Id.*

§ 2(c).  Section 9 of the Executive Order addresses "Sanctuary Jurisdictions" and states: "It is the

policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political

subdivision of a State, shall comply with 8 U.S.C. 1373." *Id.* § 9.  Section 9(a) establishes a

**funding restriction**:

> In furtherance of this policy, the Attorney General and the Secretary [of
> Homeland Security], in their discretion and to the extent consistent with law, shall
> ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373
> (sanctuary jurisdictions) are not eligible to receive Federal grants, except as
> deemed necessary for law enforcement purposes by the Attorney General or the
> Secretary. The Secretary has the authority to designate, in his discretion and to the
> extent consistent with law, a jurisdiction as a sanctuary jurisdiction.

Section 9(a) directs the Attorney General to "take appropriate enforcement action against any entity

that violates 8 U.S.C. § 1373, or which has in effect a statute, policy, or practice that prevents or

hinders the enforcement of Federal law." *Id.*

---

[1]   "RJN" refers to Request for Judicial Notice in Support of Motion for Preliminary Injunction,
filed concurrently herewith.  "__ Dec" refers to declarations of the following declarants filed
concurrently herewith: Tom Butt (Mayor), William Lindsay (City Manager), Gayle McLaughlin
(City Council Member), Allwyn Brown (Chief of Police), and Adrian Sheppard (Fire Chief).
"Ex._" refers to exhibits attached to a declaration or the RJN.

On <u>March 27, 2017</u>, Attorney General Jefferson Sessions announced that "the Department of Justice will require jurisdictions seeking or applying for Department grants to certify compliance with [8 U.S.C.] Section 1373 as a condition for receiving these awards," and that the Justice Department will take "all lawful steps to claw-back any funds awarded to a jurisdiction that willfully violates 1373."  RJN, Ex. 2 (DOJ Press Release).[2]

### B.   RICHMOND'S POLICIES MAY VIOLATE THE EXECUTIVE ORDER

Richmond is one of the most racially diverse cities in the Bay Area.  Butt Dec ¶ 3. Approximately **one-third** of Richmond's more than 100,000 residents are immigrants.  *Id.*  In particular, in the late 1980s, Richmond experienced an increase of immigrants arriving from Central America.  *Id.*  Many of these immigrants had been the victims of political persecution.  *Id.* Since arriving in Richmond, these individuals and their families have contributed to the City's success.  *Id.*

To fulfill its mission of preventing crime, maintaining order and enforcing the law, the Richmond Police Department ("RPD") engages in community policing.  Brown Dec ¶ 5; Butt Dec ¶ 4.  The community policing model requires active, engaged, and empowered neighborhood residents who freely interact with police without reservations.  Brown Dec ¶ 5.  It is critical that all residents, no matter their immigration status, are able to report crimes and assist in criminal investigations without fear that their immigration status will also be investigated.  *Id.* Over the past decade, the RPD has made significant progress in growing community trust.  *Id.* This has resulted in a significant reduction in crime and victimization.  Brown Dec ¶ 5 & Ex. 1; McLaughlin Dec ¶ 5.

Richmond City Council Ordinance No. 29-90 enacted in 1990, reaffirmed by Resolution No. 11-07 in 2007, seeks to "foster an atmosphere of trust and cooperation between the Richmond Police Department and all persons, regardless of immigration status, residing in the City of Richmond."  Brown Dec ¶ 6; Lindsay Dec, Exs. 1 (Ordinance No. 29-90) and 2

---

[2]   Because the Executive Order does not define "Federal grants," the City does not interpret that phrase as applying solely to funds from the Department of Justice, but to all Federal funds.  This interpretation is consistent with Executive Order Section 2(c) which states, in relevant part: "jurisdictions that fail to comply with applicable Federal law do not receive Federal funds. . . ."

(Resolution No. 11-07).  Policy 428 of the RPD Policy Manual states it is "department policy, consistent with its obligations under state and federal law, to adhere to the City of Richmond Ordinance 29-90" and that "all individuals, regardless of their immigration status, must feel secure that contacting law enforcement will not make them vulnerable to deportation."  Brown Dec ¶ 8 & Ex. 2.  RPD Policy Manual Section 428.4 also states: "Nothing in this policy is intended to restrict officers from exchanging legitimate law enforcement information with any other federal, state or local government entity (8 USC § 1373; 8 USC § 1644)."  *Id.*

Ordinance No. 29-90 and RPD Policy 428 helped Richmond residents to trust that they can report a crime without fear that their involvement will lead to their deportation.  Brown Dec ¶ 8.  That trust is being eroded by the Executive order.  *Id.*  RPD is noticing that residents are reluctant to cooperate out of fear and concern about RPD's relationship with the United States Immigration and Customs Enforcement ("ICE").  *Id.*  The Executive Order has increased fear in the immigrant community and made it harder for RPD to fulfill its mission and protect the public. Brown Dec ¶ 9.

Richmond believes its policies are in compliance with all state, federal and constitutional requirements.  Butt Dec ¶ 4; Brown Dec ¶ 10.  However, the Executive Order suggests that Richmond will be targeted for protecting its residents.  Butt Dec ¶ 4.  It is uncertain what actions the City must take to comply with the Executive Order.  Brown Dec ¶ 10; Butt Dec ¶ 6.

## C.   RICHMOND RELIES ON FEDERAL FUNDING TO PROVIDE ESSENTIAL SERVICES; WITHDRAWAL OF FEDERAL FUNDS WOULD BE CATASTROPHIC

The City budget provides for Richmond's services, infrastructure, and economic and community development.  Lindsay Dec ¶ 3.  Federal grants are a critical component of Richmond's budget, including grants from the Department of Commerce, Department of Defense, Department of Health and Human Services, Department of Homeland Security, Department of Housing and Urban Development, Department of Justice, Department of Labor, Department of Transportation, and the Environmental Protection Agency.  *Id.*  The City currently has active grants that have awarded **$77.2 million** in federal funds to the City.  Lindsay Dec ¶ 4. Approximately **$50 million** of these funds have already been used for ongoing programs.  *Id.*

For example:

- The Richmond Housing Authority receives approximately **$26 million** in grants from the U.S. Department of Housing and Urban Development (HUD) to provide affordable housing.  In addition to more than 550 housing units for low-income, elderly and disabled residents, the Housing Authority provides Section 8 vouchers to more than 2,000 Richmond residents who can use these subsidies to pay rent anywhere in the City.  The housing choice voucher program is the federal government's major program for assisting very low-income families, the elderly, and the disabled to afford decent, safe, and sanitary housing in the private market.  Lindsay Dec ¶ 4.

- Other HUD grants include Community Development Block Grant funds which have in the past been used for a variety of purposes, including to provide assistance to programs for lower income persons, to provide emergency and transitional housing for the homeless, to increase housing opportunities for lower income persons, and, most recently, to provide **$3.1 million** in funding to increase access to City facilities for persons with disabilities.  *Id*.

- The Department of Justice has granted over **$2.7 million** in critical funding to support law enforcement in Richmond.  For example, Richmond received an award of **$625,000** per year from the Community Oriented Policing Services program for three years to hire five police officers, and **$150,000** to expand the Richmond Police Department's body-worn camera program.  Lindsay Dec ¶ 6; Brown Dec ¶ 9.

- In addition, the Office of Juvenile Justice and Delinquency Prevention awarded **$1,500,000** to support the East Bay Mentoring Collaborative to provide vulnerable youth in low-income, high-crime neighborhoods with adult mentors.  As a result, the EBMC will serve over 450 additional youth who are at high risk of dropping out of high school and entering the juvenile justice system.  Lindsay Dec ¶ 6.

- The Department of Transportation has recently provided over **$3 million** to improve the condition of arterial streets in the community, and over **$400,000** to improve and provide safe routes for children to get to school.  Lindsay Dec ¶ 7.

- The <u>Department of Homeland Security Federal Emergency Management Agency</u>
  (FEMA) also provides significant support for training and operating the Richmond Fire
  Department Office of Emergency Services, through the State of California Governor's
  Office of Emergency Services.  Sheppard Dec ¶ 5.

These and other federal funds were granted without any preconditions relating to Richmond's policies concerning ICE.  Lindsay Dec ¶¶ 5, 8.  The loss of this revenue would have a catastrophic impact on the City, especially in the areas of public safety and assisting vulnerable populations.  Lindsay Dec ¶ 8.  The City would be unable to provide critical community services, including mandatory entitlement services.  *Id.*  Both federal programs and other programs would be lost or significantly impaired.  *Id.*  Essential City services would be affected by cuts in federal funds, including housing, public safety, environmental protection, employment and training, literacy, and transportation programs.  Lindsay Dec ¶ 9.

### D.   THE EXECUTIVE ORDER PUTS RICHMOND IN AN UNTENABLE AND DANGEROUS POSITION

Under Section 1(b) of Article IV of the Richmond City Charter the City Manager is required to prepare an annual budget for review and approval by the City Council.  Lindsay Dec ¶ 10.  Richmond has already begun the process of adopting the annual budget for the fiscal year beginning on July 1, 2017.  *Id.*  Without preliminary relief and clarification regarding the legality and effect of the Executive Order, the City is in an untenable financial situation, and decisions that must be made while awaiting a final decision in this case which could take multiple budget cycles, could cause a financial crisis.  *Id.*

Without preliminary relief, the City will be forced to choose whether to continue to provide services to City residents without knowing that the City will be reimbursed by the federal government for those services, or discontinue mandatory and essential services to its residents.  Lindsay Dec ¶ 11.  Either course of action has dire consequences and subjects the City and its residents to irreparable harm.  *Id.*

Withdrawal of federal funds from programs that rely on federal grants would put the City and its residents in a crisis, and require a significant reduction in staff and contract services.

1   Lindsay Dec ¶ 12.  The loss of federal revenue would endanger the health and safety of

2   Richmond's residents.  *Id.*  As stated by Richmond's Fire Chief, Adrian Sheppard, loss of federal

3   funding for the Richmond Fire Department Office of Emergency Services would significantly

4   impact the City's capacity to prevent, protect against, mitigate, respond to, and recover from

5   terrorist attacks and other catastrophes.  Sheppard Dec ¶ 10.  Without federal funds the City

6   would need to take drastic action such as reducing RPD patrol services to dangerous levels,

7   eliminating or substantially impairing emergency response services, and reducing government

8   services and personnel to below basic minimum requirements.  Lindsay Dec ¶ 12.

9          Attempting to comply with the Executive Order is not viable because it is uncertain what

10  actions the City must take to comply, and attempting to do so would likely interfere with policy

11  decisions that the Richmond City Council has made.  Lindsay Dec ¶ 13.  All of these

12  considerations need to be reflected in the annual budget which the City is required to adopt on or

13  before <u>July 1, 2017</u>.  Lindsay Dec ¶ 14.

14  **III.    LEGAL STANDARD**

15         To obtain a preliminary injunction, a plaintiff must establish "(1) 'that he is likely to

16  succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary

17  relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public

18  interest.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter v. Nat.*

19  *Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  In the alternative, a preliminary injunction is

20  appropriate if "serious questions going to the merits were raised and the balance of the hardships

21  tips sharply in the plaintiff's favor," so long as there is a likelihood of irreparable injury and the

22  injunction is in the public interest.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-

23  35 (9th Cir. 2011).  The Court has discretion, in appropriate circumstances, to issue a nationwide

24  injunction.  *See Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) ("[Because] the

25  Constitution vests [district courts] with 'the judicial Power of the United States'. . . , [i]t is not

26  beyond the power of the court, in appropriate circumstances, to issue a nationwide injunction.")

27  (citing U.S. Const. art. III, § 1)), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016);

28  *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017).

IV.     **ARGUMENT**

      A.     <u>THE CITY IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS</u>

          1.     <u>The Executive Order Usurps Congress' Spending Power</u>

Section 9(a) of the Executive Order violates the separation of powers inherent in the Constitution by making funding decisions that the Constitution vests in Congress, not the President.  The federal system is a system of checks and balances.  Our founders wanted to stop the President from exercising unbridled discretion like the King from whom they had just won their liberty.  Therefore, the Constitution limits the power of the President.  *See Youngstown*, 343 U.S. at 585 ("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself.").

Article I of the Constitution vests the federal spending power exclusively in Congress.  U.S. Const. art. I, § 8, cl. 1.  The President cannot unilaterally impose new restrictions on a jurisdiction's eligibility for federal funding.  The President does not have "unilateral power to change the text of duly enacted statutes."  *Clinton v. City of New York*, 524 U.S. 417, 447 (1998).  The President may veto a bill, but may not revise or revoke an appropriation by Congress.  *Id.* at 438; *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (2013) ("President does not have unilateral authority to refuse to spend the funds").  To the contrary, the President must "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3, cl. 5.  In directing that "sanctuary jurisdictions" are not eligible to receive federal funds, the Executive Order usurps Congress' spending power and violates the separation of powers inherent in the Constitution.

          2.     <u>The Executive Order Unconstitutionally Imposes New And Unrelated Conditions On Existing Federal Grants</u>

The Executive Order is also unconstitutional because it imposes new funding conditions on existing grants;[3] even Congress lacks this authority.  Once Congress has

---

[3]     *See* RJN, Ex. 2 (Attorney General stating the Justice Department will "**claw-back** any funds awarded to a jurisdiction that willfully violates 1373"); Executive Order § 9(a) (sanctuary jurisdictions "**are not eligible** to receive Federal grants"); *id.* § 9(c) (directing the Office of Management and Budget to obtain "information on all Federal grant money that **currently is received** by any sanctuary jurisdiction.") (emphases added).

1    authorized an appropriation to a State, county or city and it has been accepted, Congress cannot

2    impose new conditions, after the fact.  "[I]f Congress intends to impose a condition on the

3    grant of federal moneys, it must do so unambiguously," in advance.  *Pennhurst State Sch. &*

4    *Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  "The legitimacy of Congress' power to legislate

5    under the spending power . . . rests on whether the State voluntarily and knowingly accepts"

6    Congress' conditions.  *Id.*  "There can, of course, be no knowing acceptance if a State is

7    unaware of the conditions or is unable to ascertain what is expected of it."  *Id.*  The Executive

8    Order thus violates the Spending Clause because it seeks to claw-back funds already authorized

9    and accepted by a State, county, and city without any condition based on its status as a

10   "sanctuary jurisdiction."

11        Moreover, Congress cannot impose conditions to the acceptance of federal funds when

12   those conditions are unrelated to the purpose for which the funds are given.  *See South Dakota v.*

13   *Dole*, 483 U.S. 203, 208-09 & n.3 (1987) ("[T]he imposition of conditions under the spending

14   power" must be 'germane' or 'related' to the purpose of federal funding.")'  *New York v. United*

15   *States*, 505 U.S. 144, 167 (1992).  The Executive Order threatens the loss of all federal funds, not

16   only those related to the purposes of the Executive Order, which purpose is related to immigration.

17        Here, there is no nexus between immigration and the federal funds that Richmond receives

18   for its annual budget.  The majority of these funds are used to provide affordable housing for low-

19   income, elderly and disabled residents, and to increase access to City facilities for persons with

20   disabilities.  Other funds are used to create jobs and improve infrastructure, such as the condition

21   of arterial streets and the safety of the routes children take to school.  Richmond does receive $2.7

22   million in critical funding to support local law enforcement.  However, these funds are used for

23   purposes that are not germane to immigration; *e.g.*, hiring five police officers, expanding the body-

24   worn camera program, and supporting the East Bay Mentoring Collaborative to provide

25   vulnerable youth in low-income, high-crime neighborhoods with adult mentors.  In any event,

26   Section 9(a) of the Executive Order provides an exception for grants "deemed necessary for law

27   enforcement purposes by the Attorney General or the Secretary."

28

Because the Executive Order impermissibly imposes new and unrelated conditions on existing appropriations, it contravenes established limits to Congress' spending power.

### 3. The Executive Order Is Unconstitutionally Coercive

The Executive Order's threat to strip Richmond of all federal funds and bring enforcement actions against it for violation of federal laws is manifestly coercive and, therefore unconstitutional. Congress cannot use coercion or a "power akin to undue influence" to force States, counties or cities to act in accordance with federal policies. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 132 S. Ct. 2566, 2602 (2012) (holding Congress could not compel unwilling states to participate in Medicaid expansion under the Affordable Care Act). Under the United States Constitution, Congress cannot compel state officials to execute federal law. *Printz v. United States*, 521 U.S. 898, 933 (1997) ("[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs."). "In providing for a stronger central government, therefore, the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States. As we have seen, the Court has consistently respected this choice. We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York v. United States*, 505 U.S. 144, 166 (1992). The Executive Order violates these principles of federalism and state sovereignty and is unconstitutional.

### 4. The Executive Order Violates The Tenth Amendment

The Executive Order is also unconstitutional because it violates the Tenth Amendment of the Constitution. The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." This Amendment preserves the sovereignty of the States and local governments; but the Executive Order seeks to interfere with that sovereignty.

Under the Tenth Amendment, "Congress may not simply commandeer the legislative process of the States by directly compelling them to enact and enforce a federal regulatory program." *New York*, 505 U.S. at 161 (internal quotation omitted). "The commandeering cases

1   involve attempts by Congress to direct states to perform certain functions, command state

2   officers to administer federal regulatory programs, or to compel states to adopt specific

3   legislation." *Raich v. Gonzales*, 500 F.3d 850, 867 n. 17 (9th Cir. 2007).  This is precisely what

4   the Executive Order is designed to do, in violation of the Tenth Amendment.

5          The Executive Order exceeds the power of the President or any federal branch of

6   government because the Executive Order requires state and local governments to affirmatively

7   assist federal immigration officials by, *inter alia*, complying, at their own expense, with ICE

8   detainer requests.  The federal government has made clear that the local agency bears the

9   financial burden of the detention, providing that "[n]o detainer issued as a result of a

10  determination made under this chapter . . . shall incur any fiscal obligation on the part of the

11  Department."  8 C.F.R. § 287.7(e).  The federal government also will not indemnify local

12  governments or its officials against constitutional claims, even when they arise directly out of

13  actions the local government has taken at the direction of the federal government.  In Section

14  9(a) of the Executive Order, the "Attorney General shall take appropriate enforcement action

15  against any entity that violates 8 U.S.C. § 1373, or which has in effect a statute, policy, or

16  practice that prevents or hinders the enforcement of Federal Law."  By demanding that state and

17  local governments detain individuals who may be subject to removal at the request of federal

18  officials even if those individuals would otherwise be subject to release from custody, and by

19  ordering the Attorney General to take enforcement action against state and local governments

20  which do not comply, the Executive Order commandeers state and local officials in furtherance

21  of a federal regulatory program in violation of the Tenth Amendment to the United States

22  Constitution.

23         The Executive Order also requires that state and local governments take action to avoid

24  preventing or hindering the federal government in the enforcement of federal law.  Executive

25  Order, § 9(a).  This requirement forces local officials to act as an arm of the federal government.

26  This violates the Tenth Amendment.  The federal government cannot use the appropriation of

27  money to force Richmond to act in a certain way.  This use of an Executive Order to coerce

28

1  Richmond to act on behalf of the federal government through a threat of the loss of all federal

2  funds is unconstitutional. *Sebelius,* 132 S. Ct. at 2602-04.

3      The Executive Order further impermissibly seeks to interfere with Richmond's policy

4  decisions in enacting Ordinance No. 29-90 and Resolution No. 11-07, which further legitimate

5  local concerns and interests.  This federal interference impermissibly penalizes state and local

6  governments that are deemed to "prevent or hinder" the enforcement of federal law and thus

7  impermissibly coerces state and local governments to adopt policies and practices that support

8  the Executive Order to the subordination of state and local government interests.

9      The Executive Order additionally interferes with Richmond's ability to budget, by

10  threatening to withdraw critical federal funds that have been appropriated by Congress.

11      The Executive Order is unconstitutional because it coerces Richmond to implement

12  federal immigration policy.  The Executive Order provides that federal funds will be withheld

13  from jurisdictions that failed to comply with federal law, including specifically 8 U.S.C. § 1373.

14  Executive Order, § 9(a).  However, nothing in 8 U.S.C. § 1373 conditions any federal funding on

15  complying with 8 U.S.C. § 1373 and no federal funds which Richmond receives are conditioned

16  upon Richmond complying with 8 U.S.C. § 1373.  In fact, in light of the plain language of the

17  statute, there can be no requirement that as a condition of receiving federal funds, a jurisdiction

18  comply with 8 U.S.C. § 1373.  If the Executive Order is allowed to stand, its implementation

19  would impermissibly intrude on Richmond's exercise of powers conferred upon it by the State of

20  California, and would unlawfully restrict Richmond's ability to shape local government according

21  to Richmond's needs and policy mandates of its residents.

22      Accordingly, the Executive Order is unconstitutional under the Tenth Amendment.

23      **5.  The Executive Order Induces Violations Of The Fourth Amendment**

24      The Executive Order is also unconstitutional because it forces jurisdictions to keep

25  people in custody who otherwise would be released, thus potentially exposing the jurisdictions to

26  liability under the Fourth Amendment.  This is not an idle concern.  Public entities may be liable

27  under the Fourth Amendment for honoring an ICE civil detainer request in the absence of

28  probable cause.  *Miranda-Olivares v. Clackamas Cty.*, No. 3:12-cv-02317-ST, 2014 U.S. Dist.

1   LEXIS 50340 (D. Or. Apr. 11, 2014); *see Morales v. Chadbourne*, 793 F.3d 208, 215-216 (1st

2   Cir. 2015); *Orellana v. Nobles Cnty.*, No. 15-3852 ADM/SER, 2017 U.S. Dist. LEXIS 2438, at

3   *23-24 (D. Minn. Jan. 6, 2017); *Mendia v. Garcia*, 165 F. Supp. 3d 861, 887 (N.D. Cal. 2016).

4   Congress' spending power "may not be used to induce the States to engage in activities that would

5   themselves be unconstitutional." *Dole*, 483 U.S. at 210.  However, that is precisely what the

6   Executive Order is designed to do

7             **6.**     **The Executive Order Is Also Unconstitutionally Vague In Violation Of**

8                    **The  Due Process Clause Of The Fifth Amendment**

9        A federal law is unconstitutionally vague if it "fails to provide a person of ordinary

10   intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages

11   seriously discriminatory enforcement. *United States v. Williams*, 553 U.S. 285, 304 (2008). "It is

12   a basic principle of due process that an enactment is void for vagueness if its prohibitions are not

13   clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Desertrain v.*

14   *City of L.A.*, 754 F.3d 1147, 1155-56 (9th Cir. 2014); *Valle Del Sol Inc. v. Whiting*, 732 F.3d

15   1006, 1019 (9th Cir. 2013).

16        The Executive Order is unconstitutionally vague.  The Executive Order fails to define key

17   terms, such as "sanctuary jurisdiction."  As stated in a recent Congressional Research Service

18   report, "no official list exists of sanctuary jurisdictions—and the term itself has no formal

19   definition . . . ." *See* RJN, Ex. 3 at 8, n.30 (CRS Report R44118, *Sanctuary Jurisdictions and*

20   *Criminal Aliens: In Brief*, January 10, 2017).  Although Richmond and numerous other

21   jurisdictions have been referred to as "sanctuary cities," there are differences between the

22   ordinances and policies of the various jurisdictions throughout the nation that have been referred

23   to as a "sanctuary city."  The fact that a public entity has been called a sanctuary city, or that it

24   has enacted legislation concerning immigration policies, does not mean that it is a "sanctuary

25   jurisdiction" under the Executive Order.  No jurisdiction can determine by the language of the

26   Executive Order if it is a "sanctuary jurisdiction" subject to the Executive Order.

27        The Executive Order is also unconstitutionally vague because it does not define what

28   actions or inactions constitute a 'willful refusal' to comply with 8 U.S.C. § 1373.  The Executive

Order gives unfettered discretion to the Attorney General and the Secretary of Homeland Security without providing any rules or guidance on how that discretion should be exercised.  The Executive Order allows resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.  *See Grayned*, 408 U.S. at 109.

The Executive Order is also unconstitutionally vague because it fails to define what is meant by the phrase: "Ensure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law."  Executive Order § 2(c).  There is no way for Richmond to know what "applicable Federal law" means under the Executive Order; whether it is 8 U.S.C. § 1373, all immigration laws, or all federal laws.  For each of these reasons, the Executive Order is unconstitutionally vague.

**B.**   <u>**R**ICHMOND **W**ILL **S**UFFER **I**RREPARABLE **H**ARM **W**ITHOUT **P**RELIMINARY **R**ELIEF</u>

As shown above, Richmond is likely to succeed on the merits of its claim that Section 9(a) of the Executive Order is unconstitutional.  The Executive Order coerces the City to carry out federal immigration policies, commandeers City resources, is unconstitutionally vague, and imposes penalties without due process.  The Executive Order violates the Separation of Powers, the Spending Clause, the Tenth Amendment, the Fourth Amendment, and the Due Process Clause of the Fifth Amendment.  Such injury to constitutional rights constitutes irreparable harm. *de Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Washington v. Trump*, 847 F.3d at 1169 (same).

Due to Richmond's policies regarding immigrants, the Executive Order poses an imminent threat that all federal funding will be withdrawn pursuant to the Executive Order.  If federal funds are withdrawn, the result will be catastrophic.  As stated by Richmond's City Manager, Bill Lindsay, withdrawal of federal funds from programs that rely on federal grants would put the City and its residents in a crisis, require a significant reduction in essential services, and endanger the health and safety of Richmond's residents.  Lindsay Dec ¶ 12.  As stated by Richmond's Fire Chief, Adrian Sheppard, loss of federal funding for the Richmond Fire Department Office of Emergency Services would significantly impact the City's capacity to

1    prevent, protect against, mitigate, respond to, and recover from terrorist attacks and other

2    catastrophes.  Sheppard Dec ¶ 10.  Without federal funds the City would need to take drastic

3    action such as reducing RPD patrol services to dangerous levels, eliminating or substantially

4    impairing emergency response services, and reducing government services and personnel to

5    below basic minimum requirements.  Lindsay Dec ¶ 12.

6            Richmond also faces imminent and irreparable harm as a result of the uncertainty created

7    by Executive Order Section 9(a).  Richmond does not know when federal funding cuts will take

8    place pursuant to the Executive Order, the extent of those cuts, or whether the federal

9    government will "claw-back" funds allocated to ongoing programs.  However, Richmond has

10   already begun the process of adopting its annual budget for the fiscal year beginning on <u>July 1,</u>

11   <u>2017</u>.  As stated by the City Manager, without preliminary relief and clarification regarding the

12   legality and effect of the Executive Order, the City is in an untenable financial situation, and

13   decisions that must be made while awaiting a final decision in this case which could take

14   multiple budget cycles, could cause a financial crisis.  Lindsay Dec ¶ 10.  Without preliminary

15   relief, even if Richmond ultimately prevails, the City and its residents, *especially its most*

16   *vulnerable residents*, will have suffered irreparable harm by having been deprived of essential

17   services while the case is litigated.  Without preliminary relief, the City will be forced to choose

18   whether to continue to provide services to City residents without knowing that the City will be

19   reimbursed by the federal government for those services, or discontinue mandatory and essential

20   services to its residents.  Either course of action has dire consequences and subjects the City and

21   its residents to irreparable harm.  *Id.*

22          Moreover, the uncertainty created by the Executive Order threatens the safety and

23   welfare of Richmond's residents.  As stated by Richmond's Chief of Police, Allwyn Brown,

24   RPD is noticing that residents are reluctant to cooperate out of fear and concern about RPD's

25   relationship with ICE.  Brown Dec ¶ 8.  City Council Ordinance No. 29-90 and RPD Policy 428

26   helped Richmond residents to trust that they can report a crime without fear that their

27   involvement will lead to their deportation.  That trust is being eroded by the Executive order.  *Id.*

28   The Executive Order has increased fear in the immigrant community and made it harder for RPD

to fulfill its mission and protect the public.  Brown Dec ¶ 9.  The Executive Order is thus
interfering with a core function of local government, protecting the safety and welfare of its
residents.  These harms are ongoing and irreparable.  Attempting to comply with the Executive
Order is not viable because it is uncertain what actions the City must take to comply, and
attempting to do so would likely interfere with policy decisions that the Richmond City Council
has made.  Lindsay Dec ¶ 13.

### C.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR A PRELIMINARY INJUNCTION

When the United States is a party, equities and the public interest merge.  *Drakes Bay
Oyster Co. v. Jewell*, 747 F.3d 1073, 1099 (9th Cir. 2014).  Where, as here, there is a likelihood of a
constitutional violation, "[t]he public interest and the balance of the equities favor prevent[ing] the
violation of a party's constitutional rights."  *Ariz. Dream Act Coal. v. Brewer*, No. 15-15307, 2017
U.S. App. LEXIS 1919, at *42 (9th Cir. Feb. 2, 2017) (citing *Melendres*, 695 F.3d at 1002 ("it is
always in the public interest to prevent the violation of a party's constitutional rights")).

The federal government will suffer no harm if the motion is granted, as ICE and other
federal agents will continue to enforce federal immigration law.  But if a preliminary injunction is
denied, Richmond will suffer immediate and tangible harm: Richmond will face a financial crisis,
and be forced to choose whether to continue to provide services to City residents without
knowing that the City will be reimbursed by the federal government, or discontinue essential
services to its residents; the Executive Order will continue to erode trust and increase fear in
Richmond's large immigrant community, making it harder for RPD to fulfill its mission and
protect the public; and the City will continue to be coerced to change its laws and policies under
the threat of catastrophic harm to the safety and welfare of the City and its residents, in violation
of the Tenth Amendment of the Constitution.  Richmond is not unique in the harm it will suffer;
jurisdictions throughout the nation are facing the same Hobson's choice.  Thus, the Court should
issue a nation-wide injunction.

**V.     CONCLUSION**

For the foregoing reasons, the Court should grant preliminary injunctive relief:

(1) prohibiting Defendants from enforcing Section 9(a) of Executive Order;

(2) prohibiting Defendants from taking any action pursuant to the Executive Order that would withhold or "claw-back" federal funds appropriated or allocated by Congress; and

(3) prohibiting Defendants from taking any action pursuant to the Executive Order that would declare or render Richmond or any jurisdiction ineligible for federal funds.

Because the Executive Order applies to jurisdictions throughout the United States, the injunction should apply nationwide.[4]

Respectfully submitted,

Dated: April 4, 2017          **COTCHETT, PITRE & McCARTHY, LLP**

By:   _/s/ Joseph W. Cotchett_
          **JOSEPH W. COTCHETT**

*Attorneys for Plaintiff*

Dated: April 4, 2017          **CITY OF RICHMOND**

By:   _/s/ Bruce Reed Goodmiller_
          **BRUCE REED GOODMILLER**

*Attorneys for Plaintiff*

---

[4]    Because Richmond has shown a likelihood of success on the merits and irreparable harm, it has "necessarily establish[ed] . . . standing to seek injunctive relief." *Shell Offshore, Inc. v. Greenpeace, Inc*., 709 F.3d 1281, 1286–87 (9th Cir. 2013).  The City's claims are also ripe. *See MedImmune, Inc. v. Genentech, Inc*., 549 U. S. 118, 128-129 (2007) ("where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat"); *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (same).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### ATTESTATION OF FILING

I, Nancy L. Fineman, hereby attest, pursuant to Northern District of California, Local Rule 5-1(i)(3) that concurrence to the filing of this document has been obtained from each signatory hereto.

*/s/ Nancy L. Fineman*

**NANCY L. FINEMAN**
*Attorney for Plaintiff*