UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF RICHMOND,<br><br>    Plaintiff,<br><br>    v.<br><br>DONALD J. TRUMP, et al.,<br><br>    Defendants. | Case No. 17-cv-01535-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Dkt. No. 26, 28, 32, 33 |

## INTRODUCTION

The City of Richmond ("Richmond") has brought claims challenging the constitutionality of Executive Order 13768, "Enhancing Public Safety in the Interior of the United States" ("Executive Order"). Richmond Complaint ("RI Compl.") (RI Dkt. No. 1). The defendants have moved to dismiss Richmond's claims, arguing that Richmond lacks standing, that it has failed to state any claim against the Executive Order, and that it has failed to state a claim for declaratory relief. As discussed more fully below, I conclude that Richmond has failed to establish pre-enforcement standing to challenge the Executive Order because it has not demonstrated a well-founded fear of enforcement against it. Further, it has failed to state a viable claim for declaratory relief because it has not demonstrated that there is an actual controversy regarding its compliance with 8 U.S.C. § 1373 ("Section 1373). For these reasons, the government's motion to dismiss Richmond's claims is GRANTED.

## BACKGROUND

Richmond filed this case on March 21, 2017. *See* RI Compl. I related it to two prior-filed actions brought by the City and County of San Francisco ("San Francisco") and the County of Santa Clara ("Santa Clara"), (collectively "the Counties"). (RI Dkt. No. 6); *See City & Cnty. of*

*San Francisco v. Trump*, No. 17-cv-485-WHO, *Cnty. of Santa Clara v. Trump*, No. 17-574-WHO. On April 4, 2017, Richmond filed a motion for preliminary injunction, seeking to enjoin enforcement of the Executive Order. (RI Dkt. No. 12). It moved to shorten time on the motion so that it could be heard on April 14, 2017, at the same time as the preliminary injunction motions filed weeks earlier by the Counties. (RI Dkt. No. 13). I denied the motion, concluding that shortening time would be unduly prejudicial to the government, which would have only five days to respond to Richmond's motion. (RI Dkt. No. 15).

On April 25, 2017, I granted the Counties' preliminary injunction motions and enjoined enforcement of Executive Order 13768 section 9(a). Preliminary Injunction Order ("PI Order") (SF Dkt. No. 82); (SC Dkt. No. 98). I subsequently denied as moot Richmond's motion that sought a similar injunction. (RI Dkt. No. 25).

On May 22, 2017, Attorney General Sessions issued a memorandum ("AG Memorandum"), putting forward the Department of Justice's "conclusive" interpretation of the Executive Order. The government then moved for reconsideration of the PI Order, arguing that the AG Memorandum was a material change in fact and law that justified reconsideration. *See* (SF Dkt. No. 107); (SC Dkt. No. 113).

While the reconsideration motions were pending in the San Francisco and Santa Clara cases, the government moved to dismiss all the claims brought by San Francisco, Santa Clara, and Richmond. *See e.g.* Motion to Dismiss ("MTD") (RI Dkt. No. 26). As to the Counties, I denied the government's motion for reconsideration, concluding that the AG Memorandum was not a material change in fact or law and did not alter the analysis from the PI Order, and also denied the motions to dismiss, concluding that San Francisco and Santa Clara had established standing, as discussed at length in the PI Order, and had adequately stated all of their claims. *See* (SF Dkt. No. 146); (SC Dkt. No. 145). Now, I address the motion to dismiss Richmond's claims.

**LEGAL STANDARD**

A motion to dismiss filed pursuant to Rule 12(b)(1) is a challenge to the court's subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction," and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v.*

*Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994). The party invoking the jurisdiction of the federal court bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested. *Id.*

A challenge pursuant to Rule 12(b)(1) may be facial or factual. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In a facial attack, the jurisdictional challenge is confined to the allegations pled in the complaint. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). The challenger asserts that the allegations in the complaint are insufficient "on their face" to invoke federal jurisdiction. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). To resolve this challenge, the court assumes that the allegations in the complaint are true and draws all reasonable inferences in favor of the party opposing dismissal. *See Wolfe*, 392 F.3d at 362.

**DISCUSSION**

The federal government has moved to dismiss Richmond's claims on the grounds that Richmond lacks standing to challenge the Executive Order, has failed to adequately allege any claim against the Executive Order, and lacks standing to seek declaratory relief. Because I conclude that Richmond has failed to demonstrate pre-enforcement standing to challenge the Executive Order and has failed to allege an actual controversy regarding its compliance with Section 1373, the government's motion to dismiss is GRANTED.

**I. WHETHER RICHMOND LACKS STANDING TO CHALLENGE THE EXECUTIVE ORDER**

The government asserts that Richmond lacks standing to assert claims against the Executive Order and that its claims are unripe. In the PI Order I dedicated twenty-five pages to discussing these issues with regards to the Counties. *See* PI Order at 11-35. The framework I used in the PI Order is equally applicable to Richmond's claims.

The first step in my standing analysis was to address the government's argument that the Counties could not establish standing because the Executive Order does not change the law. I rejected this argument. The Executive Order does purport to change the law and could therefore give rise to the Counties' alleged injuries. *See* PI Order at 12-16. This discussion, which related

3

to the meaning of the Executive Order and not the policies or conduct of any particular locality, applies to Richmond.

After concluding that the Executive Order changed the law, I addressed whether the Counties had established pre-enforcement standing to challenge the Order, since the Order had not yet been enforced against them. *See* PI Order at 16-32. In assessing this issue I borrowed the framework laid out in *Babbitt v. Farm Workers*, 442 U.S. 298, 298 (1979), in which the United States Supreme Court held that a plaintiff may establish pre-enforcement standing by demonstrating "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." I concluded that San Francisco and Santa Clara had established pre-enforcement standing because (1) their policies are reasonably read as proscribed by the language of the Executive Order; (2) the Counties' claims implicated a constitutional interest; (3) the Counties' had demonstrated that the Order threatened them with a loss of federal grants or other enforcement activity; and (4) the government had indicated an intent to enforce the Order generally and against the Counties specifically.

For purposes of this Order, I will assume without deciding that Richmond has demonstrated that it has policies proscribed by the Executive Order, that its claims implicate a constitutional interest, and that it could face a loss of federal grants if the Executive Order is enforced against it. But to establish pre-enforcement standing under the *Babbitt* framework, it must also demonstrate that it has a well-founded fear that the Executive Order will actually be enforced against it. Because Richmond's complaint indicates that there is no real-world conflict between it and the federal government regarding its "sanctuary" policies, Richmond cannot meet this final burden.

In the PI Order I concluded that the government had indicated "an intent to enforce the [Executive] Order generally and against the Counties more specifically." *See* PI Order at 22. This analysis was based on statements and conduct from key government actors and agencies regarding enforcement of the Executive Order and San Francisco's and Santa Clara's "sanctuary" policies. *Id.* at 22-27. While the statements regarding general enforcement of the Order would apply

4

equally to Richmond as they did to San Francisco and Santa Clara, the more specific statements regarding San Francisco's and Santa Clara's policies were specific to those plaintiffs. For example, I noted that Santa Clara and San Francisco have both been identified by ICE as jurisdictions that "Restrict Cooperation with ICE" and that both Santa Clara County Main Jail and San Francisco County Jail are listed as two of eleven detention centers with the "highest volume of detainers issued" that "do not comply with detainers on a routine basis." *See* PI Order at 25. I noted that Attorney General Sessions and former Secretary Kelly had called out and criticized San Francisco and Santa Clara in a letter to Chief Justice Cantil-Sakauye of the California Supreme Court, by asserting that some of California's "largest counties and cities" hinder the enforcement of immigration law by "denying requests by ICE officers and agents to enter prisons and jails to make arrests." *See id.* And I noted that President Trump had threatened to defund California, calling it "out of control." *Id.* Finally, with regard to San Francisco specifically, I noted that both President Trump and Attorney General Sessions had repeatedly criticized San Francisco's sanctuary policies and blamed them for causing the death of Kathryn Steinle.

With the exception of President Trump's comment regarding the State of California being "out of control," none of these statements is applicable to Richmond. Richmond has not alleged any facts indicating that it has been identified as a city that restricts cooperation with ICE or as one that regularly declines detainer requests. Instead, Richmond alleges in its complaint that "ICE has not in the past asked Richmond for information or issued detainer requests." RI Compl. ¶ 48. This is a clear and important distinction between the Counties and Richmond. While the Counties have had a number of clashes with immigration authorities and have histories of conflict with the federal government over their sanctuary policies, Richmond, according to its complaint, has never even been asked to assist in enforcing immigration policy. Its policies have not resulted in any actual conflict between it and ICE regarding immigration enforcement.

The Executive Order is aimed at encouraging or coercing previously uncooperative localities to cooperate with ICE on immigration enforcement. The likely targets of enforcement under the Order are jurisdictions that have actually refused to cooperate with ICE and that ICE believes are hindering its immigration enforcement efforts. While Richmond's policies may

conflict with Section 1373 and the Executive Order on paper, this conflict is, currently, purely academic. Richmond has not actually refused to cooperate or assist ICE, has not declined to honor any detainer requests, and has not otherwise hindered the enforcement of federal immigration law. Given that Richmond's policies have, apparently, had no practical effect on ICE's immigration enforcement efforts, it is hard to imagine that Richmond is a high priority for the federal government's efforts to discourage "sanctuary" policies. Rather, these efforts are likely to be focused on jurisdictions from which ICE is actively seeking, but not receiving, assistance.

Despite having no real-world friction with ICE or the defendants over its policies, Richmond argues that it is likely to face enforcement under the Executive Order because it has been called a sanctuary city and because it has a large Latino population. Neither of these arguments is persuasive.

Richmond asserts that it has been called a sanctuary city, but does not say by whom or in what context. This vague assertion that someone, somewhere, referred to Richmond as a sanctuary city is insufficient to demonstrate that the federal government believes Richmond is a sanctuary city or is likely to enforce the Executive Order against it.

Richmond does not explain why having a large Latino population is likely to subject it to enforcement under the Executive Order. It is possible that Richmond is suggesting that a large Latino population goes hand-in-hand with greater ICE enforcement activity and that, because of this, ICE is more likely to ask Richmond for assistance and therefore, more likely to develop conflicts with Richmond over it local policies. But even if this is true, and Richmond does not allege any facts supporting this reading, Richmond's own experience with ICE has not borne this out. As discussed above, regardless of what its large Latino population might indicate, ICE has never asked Richmond for assistance enforcing immigration laws and has never issued a detainer request to Richmond police. Richmond has not alleged any facts supporting the contention that its large Latino population is likely to subject it to defunding under the Executive Order.

Overall, Richmond's situation draws parallels with that of the plaintiffs in *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1140 (9th Cir. 2000) (en banc). In *Thomas*, two landlords brought a pre-enforcement free speech challenge to Alaska housing laws that prohibited

1    discrimination on the basis of marital status. *Id.* at 1137. The landlords contended that they were
2    likely to face enforcement because, as devout Christians, they refused to accept unmarried, but
3    cohabiting, couples as tenants. *Id.* The Ninth Circuit dismissed the case as non-justiciable. It
4    concluded that the landlords had failed to demonstrate that they were likely to face enforcement in
5    part because the landlords could not point to clear violations of the law; no prospective tenant had
6    ever complained about their policies; and "the principal enforcement agencies had never even
7    heard of these landlords before they filed this action." *Id.* 1137, 1140. Similarly, while Richmond
8    has policies that might restrict the ability of local officials to assist ICE, these policies have never
9    been put to use as ICE has never requested information or assistance from Richmond and has
10   never asked Richmond to honor any detainer requests. There is no indication from Richmond's
11   complaint that ICE or the defendants have ever taken note of Richmond's policies in any way or
12   identified Richmond as a jurisdiction hindering the enforcement of immigration law. *Id.*

13   It is not enough to dislike an Executive Order or to worry about its implications to
14   establish pre-enforcement standing. Given the lack of a real-world controversy between
15   Richmond and the federal government regarding Richmond's sanctuary policies, and in contrast
16   with the Counties, Richmond has failed to demonstrate that it has a well-founded fear of
17   enforcement under the Executive Order. This is fatal to pre-enforcement standing.

18   **II.   DECLARATORY RELIEF CLAIM**

19   Richmond has brought a claim for declaratory relief that its laws comply with Section
20   1373. The government moves to dismiss this claim, asserting that Richmond has failed to identify
21   a right of action that would allow it to pursue declaratory relief. RI MTD at 22 (RI Dkt. No. 26).
22   The government also asserts that any such relief would be prohibited as an improper advisory
23   opinion. *Id.* Because Richmond has failed to allege facts sufficient to demonstrate that there is an
24   "actual controversy" between it and the federal government regarding its compliance with Section
25   1373, it has failed to demonstrate standing on its declaratory relief claim.

26   The Declaratory Judgment Act creates a remedy for litigants but is not an independent
27   cause of action. *See, e.g.*, *Muhammad v. Berreth*, No. C 12-02407 CRB, 2012 WL 4838427, at *5
28   (N.D. Cal. Oct. 10, 2012) ("Declaratory relief is not an independent cause of action or theory of

7

recovery, only a remedy.  The [Declaratory Judgment Act] does not itself confer federal subject-matter jurisdiction.") (citation and internal quotation marks omitted).  The Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  "[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

Richmond has not demonstrated that there is an actual controversy regarding its compliance with Section 1373 sufficient to warrant the issuance of a declaratory judgment.  It asserts that there is a substantial controversy because "Richmond alleges that it believes that it complies with the statute, but Defendants contend otherwise."  RI MTD Oppo. at 21.  If the defendants had actually indicated that they believe Richmond does not comply with Section 1373 through public statements, written notice, or otherwise, this assertion might evidence an actual controversy.  However, review of Richmond's complaint demonstrates that Richmond's assertion is pure speculation.  Its only allegation in support of this claim is a line in its complaint stating, "Richmond believes that Defendants contend that Richmond does not comply with 8 U.S.C. § 1373."  RI Compl. ¶ 116.  Richmond cites nothing but its own unsupported belief in support of its claim that the federal government believes its policy is non-compliant with Section 1373.  If this were sufficient to establish an actual controversy under the Declaratory Judgment Act, then any litigant could meet the actual controversy requirement simply by stating its belief as to the existence of a dispute.  This is not sufficient to demonstrate Article III standing.

As discussed above, Richmond has not alleged any facts indicating that, prior to this lawsuit, the federal defendants were aware of Richmond's "sanctuary" policies, that Richmond had ever put any of its policies into practice, or that the defendants had any opinion of whether Richmond's policies comply with Section 1373.  Richmond cannot manufacture standing to seek declaratory relief by citing to its own unsupported belief as to the existence of an actual

1 controversy. On the facts alleged, there is no evidence of an actual controversy regarding
2 Richmond's compliance with Section 1373. Richmond's declaratory relief claim must be
3 dismissed.

## CONCLUSION

Because Richmond has failed to demonstrate any real-world conflict between it and the federal defendants regarding its sanctuary policies, it has not demonstrated a well-founded fear of enforcement under the Executive Order. Accordingly, it has not demonstrated that it has pre-enforcement standing to challenge the Order. The government's motion to dismiss these claims is GRANTED. For similar reasons, Richmond has failed to demonstrate that there is an actual controversy regarding its compliance with Section 1373, as it has alleged no facts in support of its claim that the government believes its policies fail to comply with Section 1373. The government's motion to dismiss Richmond's declaratory relief claim is GRANTED.

Richmond's claims are dismissed without prejudice. Richmond will have 20 days from the date of this Order to file an amended complaint if it wishes to attempt to address the jurisdictional issues identified above. Richmond is also welcome to continue to participate in the litigation regarding the Executive Order as an amicus curiae, which it, and many other cities, counties, and states, have done by filing amicus briefs in the San Francisco and Santa Clara cases. *See* Richmond Amicus Briefs (SC Dkt. No. 74); (SC Dkt. No. 129); (SF Dkt. No. 40); (SF Dkt. No. 126). Richmond's perspective and position regarding the Executive Order is well-represented in these briefs. Obviously, in the event that the federal defendants in the future commence an enforcement action or otherwise target Richmond for its "sanctuary" policies, nothing in this Order would affect Richmond's ability to litigate those issues.

**IT IS SO ORDERED.**

Dated: August 21, 2017

William H. Orrick
United States District Judge